■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v EMERSON THURMAN et al., Respondents. — Order, Supreme Court, New York County, entered May 20, 1980, granting defendants' motions to suppress certain statements and physical evidence, unanimously reversed, on the law, the motions denied, the order of February 2, 1981 dismissing the indictment reversed, and the indictment reinstated, and the case remanded for trial. On the consent of all parties, permission is also granted herewith to enlarge the record to include the dismissal of the indictment, which dismissal occurred after the filing of appellant People's brief. Defendants were indicted for four counts of criminal possession of stolen property in the second degree. At the suppression hearing, the court ruled that the actions of the arresting officers amounted to a detentive stop, that the stop had been predicated on unreasonable suspicion of criminal conduct rendering the use at trial of the subsequent statements given by defendants and the physical evidence seized impermissible. On December 17, 1979 at about 3:00 P.M., two veteran police officers in civilian clothes in an unmarked police car, were working their tour of duty with the anticrime unit in a Manhattan neighborhood where daytime residential burglaries are a frequent occurrence. The attention of the officers was first drawn to defendants when the officers observed the defendants, although walking with a normal gait, rapidly moving their heads from side to side in a furtive manner. Defendant Lopez was carrying a plastic bag obviously containing some objects. The officers watched them enter a rented automobile. Once inside, the men sat with their heads together leaning towards the center of the vehicle and engaged in some activity not involving eating or drinking. One officer exited the unmarked police car to walk past the rented car. He looked through the passenger window and saw defendant Lopez examining identification papers and credit cards, showing each piece to defendant Thurman, then tossing the item into the back seat. The plastic bag defendant Lopez had been carrying was on the front seat, and the officer was able to see a jewelry box, calculator and electric razor inside it. Upon returning to the police car and reporting his observations to his partner, the two officers, with their suspicions aroused, called a backup unit for possible assistance. The officers then backed their car down the one-way street. At about the same time, defendants started

their car and began to exit from their parking place. The progress of defendants' car was blocked by the movement of the police car. At this point one officer exited the police car, displayed his shield to defendant Thurman, requested to see Thurman's driver's license and the car registration, and then asked who was the owner of the credit cards. Thurman at first denied having any credit cards. When confronted with the officers' assertion of having seen him with credit cards, Thurman then replied that they were his brother's cards. While inspecting one of the cards and some papers given to him by Thurman, the officer asked for the brother's name. Thurman replied "Edward Cassarino". The papers listed a Paul Cassarino. The officer asked "You want to try again?", whereupon Lopez stated that they had found "all this stuff by the garbage back there." The officers proceeded to place both defendants under arrest. Before proceeding to the precinct, defendant Lopez asked if he could retrieve his cigarettes from the car. The officer who accompanied him saw lock picks on the floor of the front seat. The People maintain, and we agree, that the conduct of the anticrime officers was entirely justified under the circumstances. Contrary to the contention of the People, however, the blocking of defendants' car did, in our view, rise to the level of a detentive stop. Although the almost simultaneous movement of the two cars was indeed fortuitous, defendants' car was blocked and defendants could perceive that they were not entirely free to leave the scene. *(People v Miller,* 52 AD2d 425, affd 43 NY2d 789.) Furthermore, although no guns were drawn, the officer approaching defendants' car displayed his shield and requested a driver's license and car registration. This latter action was more than a mere inquiry; it was an intrusion, though a minimal one, upon a person's privacy, requiring a degree of justification corresponding to the degree of intrusion into defendants' privacy and the degree of restriction of their freedom. *(People v Sobotker,* 43 NY2d 559; *People v Perel,* 34 NY2d 462, 465.) Even though the subsequent actions can be considered a detentive stop, there were sufficient specific and articulated facts given by the police to meet the minimum requirements of *People v Cantor* (36 NY2d 106, 113-114), for such an intrusion and to render such a stop lawful. *Cantor (supra)* requires that a founded suspicion that criminal activity is afoot must exist before the police may stop and inquire. The actions were also reasonably related in scope to the circumstances which rendered the initiation possible. *(People v De Bour,* 40 NY2d 210, 215.) The furtive behavior of defendants prior to questioning was observed by experienced officers in a neighborhood with a high rate of daytime residential burglaries. Defendants' observed acts can most certainly be characterized as suspicious. The character of the community known to the arresting officer is relevant in determining whether a given sequence of actions is suspicious. (Cf. *People v McRay,* 51 NY2d 594, 604.) The observations of the initial furtive behavior, of the plastic bag and contents, of the examination of credit cards and identification papers and the tossing of same onto the back seat, taken as a whole, and taking place in this neighborhood, gave the police a reasonable suspicion to believe defendants were involved in a crime. The items are typical of those taken in residential burglaries and their handling here was not what could be termed usual. The pattern described is one associated with criminal conduct. Such suspicion entitled the officers to ask appropriate questions. (CPL 140.50, subd 1.) Indeed, the Court of Appeals has said that "Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities." *(People v Rivera,* 14 NY2d 441, 444, cert den 379 US 978.) The questions asked were limited in scope, and thus the intrusion was minimal, comporting with the

suspicious but still, at this point, equivocal nature of defendants' actions. The evasive, inconsistent and incorrect answers of defendants when they were questioned, provided the officers with the additional relevant behavior or circumstances necessary to raise the level of inference from suspicion to probable cause. *(People v Rosemond,* 26 NY2d 101, 105; *People v Moore,* 62 AD2d 155.) The subsequent recovery of the lock picks was also proper. The officer escorting defendant Lopez back to the car to retrieve cigarettes was exercising prudent behavior in closely watching him. The lock picks were in plain view on the floor. Concur — Kupferman, J.P., Ross, Carro, Markewich and Silverman, JJ.